```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
VINCENT ARENA,

                           Petitioner,
                                                           MEMORANDUM & ORDER
            - against -                                    11-CV-1905 (PKC)

ADA PEREZ, Superintendent, Downstate
Correctional Facility,

                           Respondent.
----------------------------------------------------------x
```

PAMELA K. CHEN, United States District Judge:

Petitioner Vincent Arena ("Petitioner") seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction entered on September 29, 2008, in the Supreme Court of the State of New York, Kings County. Following a jury trial, Petitioner was convicted of one count of murder in the second degree, in violation of New York Penal Law § 125.25(3), and one count of falsely reporting an incident, in violation of New York Penal Law § 240.50(1). He was sentenced to an aggregate indeterminate term of 25 years to life in prison. Petitioner contends that his conviction should be vacated as not supported by sufficient evidence. For the reasons stated below, the petition for writ of *habeas corpus* is denied.

## BACKGROUND

**I.    FACTS**

Viewing the facts presented at Petitioner's trial in the light most favorable to the prosecution, *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008), a reasonable jury could have found the following.

On the night of September 4, 2005, Petitioner was playing cards and watching television at a social club in Brooklyn, New York, with his acquaintances John Mirablie, John Fontana, and

Matthew Munch. (Trial Tr. ("Tr.") 266-69 (Munch); Tr. 670 (Fontana).) Petitioner, Fontana, and Mirablie were all drinking beer. (Tr. 268 (Munch).) At some point, Mirablie placed a phone call to a friend of his, Anthony Braccia. (Tr. 669 (Fontana).) At around 3:30 a.m., Braccia and a friend, Antonio Calandra, arrived at the social club. (Tr. 217-20 (Calandra); Tr. 269-70 (Munch); Tr. 671-74 (Fontana).) Braccia was wearing conspicuous and expensive looking jewelry. (Tr. 279-80, 444 (Munch).) Before that night, Petitioner, Munch, and Fontana had never met Braccia or Calandra. (*Id.*) The six men—Petitioner, Fontana, Munch, Mirablie, Calandra, and Braccia—socialized at the club until around 4:45 a.m., when they decided to drive to a nearby bagel store. (Tr. 217-20 (Calandra); Tr. 269-70, 272, 275-77 (Munch); Tr. 671-74 (Fontana).) The six men rode together in Petitioner's commercial van, which resembled a small school bus, with Munch driving the van and the other five men seated in the back. (Tr. 220-21 (Calandra); Tr. 271-75 (Munch); Tr. 674-75 (Fontana).)

When the men arrived at the bagel store, everyone went inside except Munch, who stayed with the van. (Tr. 226-27 (Calandra); Tr. 281-82 (Munch); Tr. 678-79, 809 (Fontana).) Petitioner and Fontana were the first to emerge from the store, and, as they approached the van, Petitioner told Fontana that Anthony Braccia was "a jerkoff" who "deserves to get robbed." (Tr. 284-85, 447 (Munch); Tr. 679-80, 685-86, 809-11, 903, 999 (Fontana).) The other three men returned to the van a few minutes later. (Tr. 284-86, 449-50 (Munch); Tr. 905-07 (Fontana).) Munch then began to drive the men to their respective homes. Munch dropped off Mirablie first and Calandra second, leaving Petitioner, Fontana, and Braccia alone in the back of the van. (Tr. 285-88 (Munch); Tr. 229-30, 254-55 (Calandra); Tr. 688-89, 907-08, 912 (Fontana).) Although Fontana lived down the street from Mirablie, Fontana did not ask to get out of the van when Mirablie was

2

dropped off, choosing instead to stay in the van. (Tr. 908 (Fontana).) Braccia was still wearing his jewelry when Calandra was dropped off. (Tr. 230 (Calandra); Tr. 287 (Munch).)

As Munch drove the van toward the next drop-off point, Petitioner stabbed Braccia twice with a knife and demanded that Braccia remove his jewelry. (Tr. 691-92, 777-78 (Fontana).) Fontana, referring to the jewelry, told Braccia to "[t]ake it off, just take it off." (Tr. 290, 292, 471-72 (Munch); Tr. 779 (Fontana).) As Munch continued to drive the van, Petitioner continued to stab Braccia with a knife. (Tr. 780-81 (Fontana).) Fontana was not involved in the attack on Braccia, but, at some point, Braccia forcibly pinned Fontana against the windshield of the van. (Tr. 290-91, 471-74, 476 (Munch); Tr. 781-83, 926-27 (Fontana).) In the course of this physical struggle, Braccia was stabbed thirty times, and his throat was slashed. (Tr. 290-91, 293, 471-72, 477, 483 (Munch); Tr. 785-87 (Fontana).) Braccia died from his wounds in the van, and his blood covered the inside of the van, his clothes, and the clothes of Petitioner and Fontana. (Tr. 295, 478-79 (Munch); Tr. 786-87 (Fontana).) Thereafter, Munch stopped the van, and Petitioner and Fontana rolled Braccia's motionless body out of the van and onto the street. (Tr. 296, 492 (Munch); Tr. 787, 790 (Fontana).) Braccia's body was found later that morning, without any of the jewelry Braccia had been wearing the night before. (Tr. 138 (Gangi).)

After dumping Braccia's body, Petitioner, Fontana, and Munch attempted to conceal their involvement in Braccia's death. The three men changed out of their bloodied clothing and attempted to clean the bloodstains on the inside of Petitioner's van. (Tr. 297-302, 306-12 (Munch); Tr. 788-90 (Fontana).) When their attempts to remove the bloodstains from the van failed,

Petitioner told Munch to abandon the van on the outskirts of Brooklyn. (Tr. 314-16 (Munch).) Petitioner then reported the van as stolen. (Tr. 594-97 (Maldonado).)[1]

In September 2006, after a year-long investigation, New York City Police Department officers arrested Petitioner, Munch, and Fontana in connection with Braccia's death. (Tr. 1295-97, 1339-40 (Det. Yero).) Petitioner was charged with first degree murder, second degree murder, falsely reporting an incident in the third degree, and related counts. (Dkt. 4 ¶ 6.) Fontana was charged with felony murder and robbery. (Tr. 799 (Fontana).) In March 2008, Fontana and Munch entered guilty pleas pursuant to cooperation agreements with the government; Fontana and Munch each pled guilty to hindering prosecution, in satisfaction of all charges against them. (Tr. 352-53 (Munch); Tr. 799, 805 (Fontana).)

## II. TRIAL, VERDICT AND SENTENCING

Petitioner was tried before a jury in April 2008 in the Supreme Court of the State of New York, Kings County. (Dkt. 1 ¶ 6.) The government's main witnesses against Petitioner were Fontana and Munch, both of whom testified pursuant to their cooperation agreements. (Tr. 352-53 (Munch); Tr. 799, 805 (Fontana).) As first-hand witnesses to Braccia's death, Fontana and Munch testified that Petitioner was Braccia's sole assailant and responsible for Braccia's death, as set forth in the Facts section above. The government also introduced forensic evidence, including an autopsy report showing that Braccia's body had thirty stab wounds and a slashed jugular vein. (Tr. 1434-35, 1444-45 (Dr. Roman).) The medical examiner who testified at trial could not determine the order in which the wounds were inflicted, nor could she determine how many assailants had stabbed Braccia. (Tr. 1435-39 (Dr. Roman).) The medical and forensic evidence was inconclusive

---

[1] No evidence was introduced at trial regarding what happened to the knife Petitioner used to stab Braccia.

4

as to whether Braccia had been stabbed by single knife or two different knives. (*Id.*) The forensic evidence was also inconclusive as to whether Braccia had been stabbed by a single person or by multiple people. (*Id.*)

Petitioner did not testify at trial, but the defense called one of Petitioner's friends, Nikola Russo, to testify as part of Petitioner's defense. Russo described a conversation between himself and Munch during which Munch told Russo that, a couple months earlier, Fontana had gotten into a fight in a van and stabbed someone. (Tr. 1490 (Russo).) According to Russo, Munch told Russo to keep that information confidential. (*Id.*)

In the government's closing argument, the prosecutor asked the jury to find Petitioner guilty of murder in the first degree, felony murder in the second degree, and false reporting of an incident. (Tr. 1741-42.) With respect to the count for felony murder in particular, the prosecutor urged the jury to find Petitioner guilty based on the theory that Braccia was killed in the course of Petitioner and Fontana acting in concert to rob Braccia. (*Id.*) The prosecutor did not expressly argue in closing that the jury should find Petitioner guilty of felony murder based on Petitioner's own personal acts that caused Braccia's death in the course of robbing him. (*Id.*)[2]

In its charges to the jury, the trial court stated the elements of the criminal counts against Petitioner. (Dkt. 4 at ECF[3] 23-24.) With respect to the count for felony murder, the trial court did not limit its instructions to the "acting in concert" theory that the prosecution had emphasized in its closing argument. (*Id.*) Instead, the trial court instructed the jury that each element of felony

---

[2] Petitioner, however, argues that the prosecutor "made it plain" that he was asserting an "acting in concert" theory of felony murder. (Pet.'s Br. 34.)

[3] "ECF" refers to the pagination generated by the Court's CM/ECF system, not the document's internal pagination.

5

murder could be satisfied either by Petitioner's "personal" actions or by Fontana's actions to the extent the jury found that Petitioner was "acting in concert with Fontana." (*Id.*)

The jury found Petitioner not guilty of murder in the first degree, but guilty of felony murder in the second degree and falsely reporting an incident. (Dkt. 4 ¶ 7.) With respect to the count for felony murder, the jury's general verdict did not indicate whether the jury believed that Petitioner "personally" caused Braccia's death, or believed that it was Fontana who caused Braccia's death, with Petitioner merely "acting in concert" with Fontana to rob Braccia. (*Id.*) On September 29, 2008, Petitioner was sentenced to concurrent prison terms of twenty-five years to life on the felony murder count and one year on the false reporting count. (Dkt. 4 ¶ 8.)

### III. EXHAUSTION OF STATE REMEDIES

Petitioner appealed his conviction to the Supreme Court of New York, Appellate Division, Second Department ("Appellate Division"). (Dkt. 4 ¶ 9.) On direct appeal, Petitioner asserted several claims of error in his conviction, including, as relevant here, that his conviction for felony murder was against the weight of the evidence. (*Id.*) In particular, Petitioner argued that "[because] the felony murder count was predicated on the concerted robbery as an underlying felony, and the evidence of such robbery was insufficient, the evidence of felony murder was equally insufficient, and that count must be reversed and dismissed." (Pet.'s App. Div. Br. 19.)

The Appellate Division rejected all of Petitioner's claims of error and affirmed his conviction and sentence. (Dkt. 1 at ECF 5-7.) With respect to Petitioner's arguments about the sufficiency of the evidence, the Appellate Division held that, "[v]iewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." (Dkt. 1 at ECF 6.) The New York Court of Appeals denied

Petitioner's application for discretionary review on August 18, 2010, and Petitioner did not file a petition for writ of certiorari in the United States Supreme Court. (Dkt. 1 ¶¶ 8-9.)

## IV. INSTANT PETITION

On April 19, 2011, Petitioner timely filed the instant petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, seeking vacatur of his conviction for felony murder in the second degree. (Dkt. 1 at ECF 2-3.) Petitioner asserts as his sole ground for *habeas* relief that he was denied "due process because the evidence of murder in the second degree (felony murder) under an acting in concert theory was legally insufficient in that cooperating witnesses Munch and Fontana—the two individuals in the van with petitioner—denied having participated in any way in the underlying robbery of decedent Braccia, and thus an essential element was not proven beyond a reasonable doubt." (Dkt. 1 at ECF 2-3.)

## DISCUSSION

## I. EXHAUSTION

As a threshold matter, a prisoner seeking *habeas* relief in federal court must have exhausted his state remedies by "presenting [his] constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014) (citing 28 U.S.C. § 2254(b)). "This requires that the prisoner 'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'" *Id.* at 133 (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)). "While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" *Id.* (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

7

Here, Respondent concedes that Petitioner raised his insufficiency of evidence claim on direct appeal to the Appellate Division and in his petition seeking review by the New York Court of Appeals. (Dkt. 4 ¶¶ 9, 13.) Petitioner has properly exhausted his state law remedies with respect to the claim asserted in the instant petition.

## II. PROCEDURAL BAR

Under 28 U.S.C. § 2254, the Court need not consider the merits of any claim that is procedurally defaulted. *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "A procedural default occurs in one of two ways." *Jackson*, 763 F.3d at 133. First, it occurs when "the state prisoner fails to exhaust his state remedies . . . ." *Id.* Second, it occurs "if the state court's rejection of a federal claim rests on state law grounds—such as the operation of a state procedural rule—that is both independent of the federal question and adequate to support the judgment." *Id.* (quotation omitted); *accord Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quotation omitted)); *Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court."). "The preclusion of federal review applies only when 'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)).

As noted above, Petitioner exhausted his state remedies with respect to the claim presented here. In addition, the highest state court to consider Petitioner's insufficiency of evidence claim, the Appellate Division, concluded that "the evidence . . . was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." (Dkt. 1 at ECF 6.) The Appellate Division did not reject Petitioner's insufficiency of evidence claim solely "on state law

8

grounds—such as the operation of a state procedural rule." *Jackson*, 763 F.3d at 133. In short, there is no procedural bar to Petitioner's federal *habeas* claim.

## III. STANDARD OF REVIEW

A federal district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If a petitioner's claim was "adjudicated on the merits in State court proceedings,"[4] the district court may grant the petition if the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A State court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,'" the State court arrived at an opposite result. *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

A State court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at

---

[4] An "adjudication on the merits" is one that "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quotation omitted).

9

413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410; *see also Grayton v. Ercole*, 691 F.3d 165, 174 (2d Cir. 2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable."). A federal *habeas* court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102.

Furthermore, "[i]n § 2254 proceedings[,] a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard set forth in *Brecht v. Abrahamson*." *Jackson*, 763 F.3d at 140 (internal brackets and quotation omitted). Under *Brecht*, "a federal court may overturn a state conviction only when the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Brecht*, 507 U.S. at 637). In this regard, "[t]he strength of the prosecution's case without the erroneously admitted evidence 'is probably the single most critical factor in determining whether the error was harmless.'" *Id.* To evaluate the importance of the wrongly admitted evidence, a federal court considers "(1) the prosecutor's conduct with respect to the evidence, (2) whether the evidence bore on an issue plainly critical to the jury's decision, and (3) whether the evidence was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." *Id.* (quotation marks omitted).

## IV. ANALYSIS

As noted above, Petitioner asserts a single ground for *habeas* relief: "the prosecution failed to prove that Braccia's death actually occurred in connection with a robbery in which Arena and Fontana acted in concert, and thus the evidence was insufficient as to [the felony murder count], in violation of Arena's right under the federal constitution to be convicted only 'upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime of which he [was] charged.'" (Pet.'s Br. 2 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).)

On federal *habeas* review, the Court generally does not have authority to grant relief based on an independent review of the weight of the evidence supporting a state jury's verdict. *See Young v. Abrams*, 698 F.2d 131, 135-36 (2d Cir. 1983). On direct appeal, the Appellate Division affirmed Petitioner's conviction, noting specifically that it had "fulfill[ed] [its] responsibility to conduct an independent review of the evidence," and was "satisfied that the verdict of guilt was not against the weight of the evidence." (Dkt. 1 at ECF 6.) The federal *habeas* mechanism does not authorize this Court to second-guess that evaluation. *Young*, 698 F.2d at 135-36.

The circumstances in which a federal district court may grant *habeas* relief based on insufficiency of the evidence are extremely narrow. As the Supreme Court recently explained:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 772 (2010)). Indeed, the Supreme Court "h[as] made clear that *Jackson* claims[—*i.e.*, *habeas* claims asserting insufficiency of the evidence—] face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference," one layer of deference to the jury, and a second layer of deference to the reviewing State court. *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012).

Against this background, the Court considers the merits of Petitioner's claim that there was insufficient evidence to convict him of felony murder under New York Penal Law § 125.25(3). New York Penal Law defines felony murder as follows:

> A person is guilty of murder in the second degree when: Acting either alone or with one or more other persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime . . . he, or another participant, if there be any, causes the death of a person other than one of the participants.

N.Y. Penal Law § 125.25(3).

Petitioner does not contend that the trial court's charges to the jury failed to accurately describe the elements of felony murder under the New York Penal Law. Petitioner argues, rather, that there was no evidence introduced at trial that supported his conviction for felony murder. (Pet.'s Br. 19-20, 26-28.) According to Petitioner, the jury's decision to acquit Petitioner on the count of murder in the first degree demonstrated that the jury did not believe Petitioner was the one who stabbed Braccia, and, therefore, the jury must have convicted Petitioner of felony murder based on his acting "in concert with" Fontana to rob Braccia, even though it was Fontana (not Petitioner) who stabbed and killed Braccia. (Pet.'s Br. 26-27; *see also* Pet.'s Reply Br. 1 (asserting that "[t]here was a considerable risk here that Arena—who was acquitted of intentional murder . . .—was convicted of felony murder based on the jury's conclusion that it was Fontana, and not Arena, who had stabbed Braccia to death, but that Arena and Fontana had acted together to rob Braccia").) Petitioner claims that a verdict resting on that premise cannot stand because "[s]uch a finding under an acting in concert theory was not supported by legally sufficient evidence . . . since there was no evidence that Fontana intended to rob Braccia, let alone shared such intent with Arena." (Pet.'s Reply Br. 1-2.)

Given the deferential standard of review that applies here, the Court must reject Petitioner's claim of insufficiency of the evidence. In his argument, Petitioner places great emphasis on Fontana's and Munch's testimony in which they denied any intent to rob Braccia and denied any involvement in the brutal stabbing and killing of Braccia. (*E.g.*, Pet.'s Br. 29-30.) But Petitioner ignores the extensive and obvious circumstantial evidence from which a rational juror

12

could have concluded that Arena and Fontana had a common intent to rob Braccia of his jewelry. The record shows that minutes before the stabbing, Fontana and Arena walked out of the bagel shop together talking about Braccia. Fontana also admitted that he lived down the street from Mirablie, yet did not ask to be dropped off at the same time as Mirablie, suggesting that Fontana was motivated to remain in the van after Mirablie and Calandra were dropped off. The record also shows that Fontana actively participated in concealing the killing of Braccia, and one witness, Nikola Russo, testified that Munch admitted that Fontana had stabbed Braccia.[5] Finally, when Arena began to stab Braccia, Fontana told Braccia to just "let go" of his jewelry. Based on these circumstances, a rational juror could have concluded beyond a reasonable doubt that Fontana and Arena had a common purpose to rob Braccia. Furthermore, this Court cannot say, as would be required to vacate Petitioner's conviction under *Jackson*, that the Appellate Division was objectively unreasonable to reject Petitioner's insufficiency of evidence claim and affirm Petitioner's conviction.

Furthermore, even if the Court agreed with Petitioner that no rational juror could have found beyond a reasonable doubt that Petitioner and Fontana "acted in concert" to rob Braccia, the Court nonetheless would not grant *habeas* relief. New York Penal Law § 125.25(3) makes clear that a defendant can be convicted of felony murder even if he is acting "alone." The trial court's jury charge reflected this form of felony murder by instructing the jury that each element of the crime could be satisfied either by Petitioner's "personal" actions or by Fontana's actions, to the

---

[5] Although Russo's testimony that Fontana stabbed Braccia could have caused the jury to discredit Fontana's and Munch's identification of Petitioner as the lone stabber, it nonetheless supported a felony murder theory, by providing evidence of Fontana's complicity in the three men's plan to rob the victim. In order to convict Petitioner of felony murder, the jury did not need to find that he was the sole person, or even one of the persons, who stabbed Braccia, but only that he "acted in concert" with Fontana and Munch to commit the robbery that resulted in Braccia's death. (*See* Dkt. 4 at ECF 23-24 (jury instruction on felony murder charge).)

13

extent the jury found that Petitioner was "acting in concert with" Fontana. (Dkt. 4 at ECF 23-24.) Given the extensive testimony from Fontana and Munch that established Arena's intentions to rob Braccia and Arena's subsequent attack on Braccia, a rational jury could have found that Arena, acting alone, caused Braccia's death in the course of robbing him.[6]

## CONCLUSION

For the reasons set forth above, the Court denies Petitioner's application for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Because Petitioner has not made a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully requested to enter judgment and close this case.

---

[6] Petitioner argues that his conviction cannot be sustained based on the theory that Petitioner himself stabbed Braccia. First, Petitioner argues that "[t]he acquittal of Arena on [murder in the first degree] . . . indicates that the jury was not convinced that it was Arena who had stabbed Braccia." (Pet.'s Br. 26.) The Court disagrees. Given the facts introduced at trial, a rational juror could have concluded that Petitioner lacked the specific intent needed to convict him of murder in the first degree, yet still was the one, or one of the ones, who stabbed Braccia in the course of robbing him. Second, Petitioner argues that, under New York law, a general verdict, like the one returned in Petitioner's case, cannot rest on a jury charge that invites the jury to render a general verdict based on one or more "alternative theories" of the same crime. According to Petitioner, New York law prohibited the trial court from instructing the jury that each element of felony murder could be satisfied *either* by Petitioner's "personal" actions *or* by Fontana's actions, to the extent the jury found that Petitioner was "acting in concert with" Fontana. (Pet.'s Br. 27-29.) However, the Court cannot grant federal *habeas* relief based on a supposed violation of New York law governing general verdicts. For purposes of this Court's *habeas* review, "when disjunctive theories are submitted to the jury and the jury renders a general verdict of guilty, . . . [i]f [the defendant's] challenge [to the submission of disjunctive theories] is *evidentiary*"—as Petitioner's challenge is here—"as long as there was sufficient evidence to support one of the theories presented, then the verdict should be affirmed." *United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993) (citing *Griffin*, 502 U.S. 46, 50 (1991)); *accord Lopez v. Smith*, 135 S.Ct. 1, 5 (2014).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 19, 2017
      Brooklyn, New York